21-2982-cr
*United States v. McCain*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of March, two thousand twenty-three.

PRESENT: DENNIS JACOBS,
ALISON J. NATHAN,
 *Circuit Judges,*
HECTOR GONZALEZ
 *District Judge.*\*

---

United States of America

 *Appellee,*

 v.                                                             No. 21-2982

Romano McCain,

 *Defendant-Appellant.*

---

FOR APPELLEE:                                   CARINA H. SCHOENBERGER, Assistant
                                                United States Attorney, *for* Carla B.
                                                Freedman, United States Attorney for the
                                                Northern District of New York, Syracuse,
                                                NY.

---

\* Judge Hector Gonzalez, of the United States District Court for the Eastern District of New York, sitting by designation.

FOR DEFENDANT-APPELLANT: PETER J. TAMAO, Garden City, NY.

Appeal from an order of the United States District Court for the Northern District of New York (D'Agostino, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Following a jury trial, Defendant-Appellant Romano McCain was convicted and sentenced on two counts of interstate transmission of threats and one count of possession of a firearm and ammunition in violation of a court order. McCain appeals his conviction and sentence, arguing that the district court erred by 1) improperly admitting prejudicial evidence of uncharged conduct; 2) limiting cross-examination about a victim-witness's drug dealing; 3) denying his motion for acquittal based on insufficiency; and 4) incorrectly applying a six-level enhancement in the Guidelines calculation for conduct evincing an intent to carry out a threat. We assume the parties' familiarity with the underlying facts and the record of prior proceedings, to which we refer only as necessary to explain our decision.

## BACKGROUND

On September 30, 2020, McCain was indicted on one count of possession of a Taurus .38 caliber revolver and ammunition in violation of a court order, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2) (Count One), and two counts of interstate transmission of threats to injure, in violation of 18 U.S.C. § 875(c) (Counts Two and Three). Trial commenced on May 24, 2021, and lasted four days. The government presented witness testimony as well as records of messages McCain sent in early 2020. The evidence depicted two incidents of threatening conduct. First, on January 10, 2020, McCain exchanged threatening Facebook messages with Francis Short, who owed him $65. *See, e.g.*, Gov't App'x 734 ("Bro..just have my money….i play with guns..no fighting….and

2

i always have one on me . . . ."); *id.* ("i will blow your fucking head off.")   Second, around January 31, 2020, McCain exchanged threatening messages with Brandon Negron, which similarly escalated after Negron posted online that McCain owed him money: "I will kill your daughter..bro. . . . we at the strip in morning..be there..me and my girl..with the heat..see you there."   Gov't App'x 744.   A local police detective testified that "heat" refers to guns.

On February 23, 2020, McCain allegedly fired an AK-47-type rifle towards a group of people at a location known as "The Strip," where motorsports enthusiasts ride offroad vehicles. Although McCain was not charged with any crimes relating to this incident, the government introduced the testimony of several witnesses who were at The Strip on February 23rd or viewed video footage of the incident, and several law enforcement officers who investigated the incident. According to this testimony, McCain arrived at The Strip with his girlfriend, Shonda Cheers, in her truck.   There, McCain got into a fistfight with a person identified to the jury only as "Julio."   Then McCain returned to Cheers's truck, pulled out a "long rifle," and—while struggling over the weapon with Cheers—discharged it in the direction of nearby people.

The day before the shooting at The Strip, McCain exchanged messages with an individual identified as "C. James" and asked for Negron's address saying, "we going too him.." and "Fuck all this talking..." Gov't App'x 534–35; 767.   C. James responded, "Bro they been at strip every Sunday waiting for u u threaten to take a babys life . . . he said strip tom at 12."   Gov't App'x 767. McCain responded, "Ok" and "If you fuck with me ..i hit you where it hurts.   Bro..real talk..dont comeout…its going too be gun play . . . ."   Gov't App'x 767.

Five days after the incident at The Strip, law enforcement executed an early morning, warrant-authorized search of Cheers's apartment.   McCain was present at the apartment when law

3

enforcement arrived. McCain waived his *Miranda* rights and informed law enforcement that he lived there and that they could find a loaded .38-Special caliber revolver—which he denied owning or touching—in the master bedroom. No DNA or fingerprints were recovered from the gun, which had been purchased by Cheers's relative in Ohio.

At the conclusion of the trial, the jury returned a guilty verdict on all counts. On November 29, 2021, the district court sentenced McCain to a Guidelines sentence of forty-six-months' imprisonment on each count, to be served concurrently. In doing so, the district court applied a six level enhancement to the Guidelines calculations based on conduct manifesting an intent to carry out threats against Negron.

## DISCUSSION

### I. Admission of Evidence Regarding Uncharged Conduct

McCain argues that his convictions should be vacated because the district court committed prejudicial error when it allowed testimony regarding the uncharged shooting on February 23, 2020. We conclude the district court acted within its discretion in admitting testimony about the shooting.

Before trial, McCain moved to exclude video and testimony regarding the shooting under Rule 404(b) of the Federal Rules of Evidence. After oral argument, the district court reserved decision on McCain's motion in a fifteen-page decision, which indicated that the court would revisit the issue at trial depending on the defenses raised. Following opening statements and the defense's cross-examination of the first witness, the government sought to introduce testimony regarding the shooting. The government argued that this evidence was necessary to rebut McCain's defense that the messages he sent were just tough talk and not intended as threats. It argued that the jury needed to be informed that McCain did in fact "mean it because he showed up with a gun like he said on

4

February 23rd." Gov't App'x 168. The district court determined that testimony concerning the shooting should be admitted because McCain's defense on Counts Two and Three contested his subjective intent to make the statements "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," *Elonis v. United States*, 575 U.S. 723, 740 (2015).[1] The district court also concluded that the incident at The Strip corroborated McCain's messages discussing his and Cheers's joint possession of firearms and was relevant to McCain's intent and motive with respect to Count One, the unlawful possession charge, which the prosecution was proving based on a constructive possession theory. The district court further concluded pursuant to Rule 403, that the probative value of testimony regarding the shooting was not substantially outweighed by the risk of unfair prejudice. While this testimony was admitted, the district court forbade prosecutors from playing video of the incident—though it did allow witnesses to describe what the video showed. The district court also provided a limiting instruction to accompany this testimony:

> The defendant is not charged with any crimes based on anything that may have happened on February 23rd, 2020. . . . You may not consider this evidence as any kind of reflection on the defendant's character or propensity to commit the crimes charged in the superseding indictment which is before you. This evidence may be considered by you only to the extent that it bears upon the defendant's knowledge, intent, or motive to commit the acts charged . . . .

Gov't App'x 190–91.

A trial judge's evidentiary rulings are reviewed for abuse of discretion. *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012). This Court is particularly deferential to the district court's Rule 404(b) rulings because "a district court is in the best position to evaluate the evidence and its effect on the jury," and we reverse the admission of uncharged bad acts evidence "only if the judge

---

[1] Unless otherwise indicated, all internal citations, quotation marks, and alterations are omitted.

5

acted arbitrarily and irrationally." *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020).

Under Rule 404(b), evidence of a defendant's uncharged bad conduct is inadmissible to show their propensity to commit the crimes they are charged with, but may be admitted to prove, among other things, motive, opportunity, and intent. Fed. R. Evid. 404(b). This Court has adopted an "inclusionary" approach to Rule 404(b), which means uncharged conduct evidence may "be admitted for any purpose other than to demonstrate criminal propensity." *Scott*, 677 F.3d at 79. Still, our "inclusionary rule is not a carte blanche to admit prejudicial extrinsic act evidence [that] is offered to prove propensity," *id.*, or otherwise to allow "propensity evidence in sheep's clothing," *United States v. McCallum*, 584 F.3d 477, 475 (2d Cir. 2009). To determine whether the court properly admitted 'other act' evidence, we consider "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *Scott*, 677 F.3d at 79.

Applying that framework, we conclude that the district court did not abuse its discretion in admitting testimony regarding the shooting. Evidence regarding the shooting was offered for, and relevant to, whether McCain intended his communications as threats or knew that they would be so received. McCain's defense at trial was that the messages were just "smack talk" typical of the motorsport culture around "beefing." This clearly put his intent in dispute. Thus, the evidence about the shooting "was admitted not to show that he had a propensity to act in a particular way, but to meet the defense argument" on this point. *United States v. Williams*, 930 F.3d 44, 62 (2d Cir. 2019). And this evidence was relevant because McCain's access to, and willingness to use, an AK-47-type gun "tended to make more probable the factual inference that [he] intended to . . .

6

make a genuine threat because he had collected the means . . . to follow through." *United States v. Bayon*, 838 F. App'x 618, 620–21 & n.1 (2d Cir. 2021) (summary order) (affirming introduction of the defendant's possession of bomb-making books as relevant to his intention to "make good on his threats" to harm members of Congress). Furthermore, Short was at The Strip at the time of the shooting and while Negron was not, McCain's text messages with C. James from the day before allowed the jury to infer that he may have gone to The Strip intending to carry out his prior threat against Negron.

Likewise, the district court was within its discretion to conclude that McCain's actions at The Strip were relevant to his constructive possession of the firearm found in Cheers's apartment. To prove constructive possession, the government needed to show that McCain "knowingly ha[d] the power and the intention at a given time to exercise dominion and control over" the revolver found in Cheers's apartment. *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019). In the leadup to the shooting, McCain sent multiple text messages asserting that he controlled weapons jointly with Cheers. McCain's arrival at The Strip with Cheers and use of a gun taken from the back of Cheers's truck corroborated these statements. Furthermore, McCain's recent possession of the AK-47-type gun was relevant to his power and motive to possess the revolver. Testimony regarding the events at The Strip allowed the jury to conclude that McCain had access to firearms in Cheers's possession, and that having recently threatened several people and used a firearm, he had a motive to possess the revolver found in the apartment. *See United States v. Bailey*, 800 F. App'x 35, 37 (2d Cir. 2020) (summary order) ("This Court has regularly affirmed the admission of [prior] firearms possession to establish that the defendant had the opportunity to access firearms." (collecting cases)).

7

Finally, the district court did not abuse its discretion in concluding that the probative value of testimony regarding the shooting was not substantially outweighed by its prejudicial impact. The district court waited until it was certain that the shooting would be directly relevant to the issues at trial, excluded video of the shooting, prohibited the government from referring to the gun used as an "AK-47," and repeatedly issued instructions limiting the jury's use of the evidence to its permissible purposes. Such "pruning [of] the government's proffered evidence . . . reflects the proper balancing process required under Rule 403." *United States v. Moran-Toala*, 726 F.3d 334, 346 (2d Cir. 2013). Given the district court's careful efforts to minimize the prejudicial effect of the shooting and the fact that its "first hand exposure to the" trial put it in a "superior position to evaluate the likely impact . . . we decline to second-guess [its] decision." *United States v. Williams*, 930 F.3d 44, 63–64 (2d Cir. 2019).

## II. Limitation on Cross-Examination

The district court did not allow McCain to cross-examine Negron regarding allegations that Negron was a drug dealer. McCain argues his Sixth Amendment right to confront Negron was violated because the district court's ruling prevented him from developing an argument that Negron did not perceive McCain's communications as threatening because after he received them, he continued "going about his daily business . . . selling drugs left and right." Gov't App'x 226. We again find no abuse of discretion in the district court's ruling.

We review "a trial court's decision to limit the scope of cross-examination[] for abuse of discretion." *United States v. Sampson*, 898 F.3d 287, 308 (2d Cir. 2018). Pursuant to Rule 608(b) of the Federal Rules of Evidence, "a district court is accorded broad discretion in controlling the scope and extent of cross-examination, and may impose reasonable limits on cross-examination to

8

protect against, *e.g.*, harassment, prejudice, confusion, and waste." *Id.* Factors we consider in reviewing a limitation on cross-examination include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

We identify no abuse of discretion in the district court's decision to preclude the defense from cross-examining Negron about dealing drugs. First, drug dealing is not a crime of dishonesty and therefore is not necessarily probative of Negron's credibility. *See United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (holding that past murder conviction not probative of truthfulness). Second, Negron's continued engagement in drug dealing was of very limited probative value to the element the government needed to prove: that "a reasonable person hearing or reading the statement and familiar with its context would understand it as a serious expression of an intent to inflict an injury." *United States v. Turner*, 720 F.3d 411, 426 (2d Cir. 2013). Finally, McCain had "ample grist for cross-examination" and indeed "questioned [Negron] extensively," *Flaharty*, 295 F.3d at 191, thereby eliciting many other facts on cross-examination suggesting that Negron did not feel threatened, including that he mocked McCain to his friends, did not contact the police or Facebook regarding the messages, and did not block McCain on Facebook. On this record, the district court acted well within its discretion in limiting the scope of cross-examination.

## III. Sufficiency of the Evidence

McCain next argues that the evidence presented at trial was insufficient to support his

9

convictions.    We disagree and conclude that the evidence is more than sufficient to support McCain's convictions.

"A defendant challenging the sufficiency of the evidence after a conviction by jury bears a heavy burden."    *United States v. Moseley*, 980 F.3d 9, 25 (2d Cir. 2020).    We "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.    We must affirm if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."    *United States v. Babilonia*, 854 F.3d 163, 174 (2d Cir. 2017).

**A.  Threats**

A person violates 18 U.S.C. § 875(c) by "transmit[ting] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another."    18 U.S.C. § 875(c). The Court has long applied an objective test to determine if a given communication is a "threat" for purposes of 18 U.S.C. § 875(c): *i.e.*, whether "an ordinary, reasonable recipient" familiar with the context of the communication "would interpret it as a threat of injury." *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006).    More recently, the Supreme Court articulated a subjective element: a defendant must also have transmitted the communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Elonis*, 575 U.S. at 740. McCain does not dispute that both the objective and subjective elements apply, but argues that neither was met.    He is incorrect.

On the objective prong, McCain made specific, violent threats towards people he was in financial disputes with, he gave no indication that his words were meant in jest, and both Short and

10

Negron testified that they took them seriously. By rendering a guilty verdict, the jury necessarily rejected McCain's argument that his statements were merely bluster typical of motorsports culture. This Court must "defer to the jury's resolution of the witnesses' credibility" and weighing of the evidence. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000). Based on the evidence, the jury could rationally find the government proved this element beyond a reasonable doubt.

There was also sufficient evidence to support the subjective prong. "[I]ntent is often established by circumstantial evidence." *United States v. Anderson*, 747 F.3d 51, 66 (2d Cir. 2014). A considerable amount of circumstantial evidence allowed the jury to rationally infer that McCain had the requisite intent. McCain repeatedly called Short and even went to his mother's house after making his threats to try and get the money he was owed. And as for Negron, the jury could infer McCain's intent to truly threaten him based on the testimony that he brought an assault rifle to The Strip on February 23rd under the belief that Negron would be there to fight him. In light of these actions, a rational jury could conclude McCain made the statements "for the purpose of issuing a threat," knowing he was capable of carrying it out. *Elonis*, 575 U.S. at 740.

**B. Possession**

Title 18 U.S.C. § 922(g)(8) prohibits a person who is subject to certain court-issued restraining orders from "possess[ing] in or affecting commerce, any firearm or ammunition." To prove a violation of § 922(g)(8), "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019). A defendant possesses a firearm constructively where he "knowingly has the power and the intention . . . to exercise dominion and control over [the] object." *Albarran*, 943 F.3d at 118. McCain disputes

11

that the evidence proves he possessed the .38 caliber revolver.

In our assessment, the record is sufficient for a rational jury to conclude that McCain constructively possessed the revolver. McCain slept in the room where the gun was found, and law enforcement found personal documents belonging to McCain in a safe in the same room. McCain knew where the gun was and that it was loaded; and he had repeatedly indicated that he and Cheers jointly possessed firearms, assertions reinforced by his conduct at the Strip. Finally, though McCain told officers that he never touched the gun, he was unable to square this denial with his knowledge that it was loaded, an omission that could have led the jury to conclude that his denial of ownership was false. On this record, the jury could conclude that McCain possessed the requisite intent to exert dominion and control over the revolver. *See Albarran*, 943 F.3d at 119.

## IV. Sentencing Enhancement

Finally, McCain challenges the district court's computation of his Guidelines range. We affirm on this issue as well.[2] Section 2A6.1 of the Guidelines provides for a six-level enhancement "[i]f the offense involved any conduct evidencing an intent to carry out [a] threat" to injure a person or property. U.S.S.G. § 2A6.1(b)(1). "To trigger this section, the conduct proffered as probative of such an intent must have occurred either contemporaneously with or after the threat." *United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995).

---

[2] At oral argument it came to light that McCain has been released from prison. Our cases indicate that release from custody generally does not moot a defendant's challenge to his Guidelines calculation so long as the possibility that the district court might impose a reduced term of supervised release as a result of a discovered error is not "so remote and speculative" as to render an opinion on the merits advisory. *United States v. Blackburn*, 461 F.3d 259, 262 (2d Cir. 2006). Because neither Judge D'Agostino nor the parties discussed supervised release at sentencing, the record does not permit us to conclude with near certainty that Judge D'Agostino would impose the same term of supervised release on resentencing if the Guidelines calculation were found to be erroneous. *Id.* at 262 n.2. Thus, McCain's challenge to his sentence is not moot.

The district court adopted, over McCain's objection, the recommendation of the probation department to apply this enhancement for Count Three. This enhancement yielded a total offense level of 21 that, along with McCain's Category I criminal history, resulted in a Guidelines range of 37 to 46 months' imprisonment. The district court imposed a sentence at the top-end of this range: 46 months' imprisonment on each count of conviction, to run concurrently.

We review a district court's interpretation of the Sentencing Guidelines *de novo*, and its factual determinations for clear error. *United States v. Richardson*, 521 F.3d 149, 156 (2d Cir. 2008). The Court finds clear error "only when the record as a whole leaves it with the definite and firm conviction that a mistake has been committed." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012).

We cannot find clear error in the district court's conclusion that McCain's actions on February 23rd manifested his intent to carry out his threats against Negron. The district court concluded that McCain went to The Strip with a gun in part based on his belief that Negron would be there. Thus, the court concluded that McCain did exactly what he had previously threatened to do: meet Negron at The Strip "with the heat." Gov't App'x 744. On this record, we are not left "with the definite and firm conviction" that the court's conclusion was mistaken.

\* \* \*

We have considered McCain's remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

13